# EXHIBIT D

**Regional Labour Court**                                    J.L.D. _____

**Tel Avi-Yafo**

| | |
|---|---|
| **Plaintiff**: | **Adi Haft,** I.D. 057682916 |

by Advs. Maya Schneider Hecht and/or Gideon Weinbaum and/or Roni Abelski
Epstein, Rosenblum, Maoz (ERM) Law Offices
111 Arlozorov Street, Tel Aviv 62098
Tel: 03-6061600; Fax: 03-6061601

and by Adv. Tamar Winter Kamar of Orna Lin & Co. Offices
4 Kaufmann Street, Tel Aviv 6801296
Tel: 03-5165757; Fax: 03-5165999

- v. -

**Defendants**:    1. **T.V.M. Design Services Ltd.,** priv. co. no. 512495219

2. **TVM Europe GmbH,** a privately held company incorporated in Germany

3. **GBG International Holding Company Limited,** a privately held company incorporated in the U.K.

4. **Global Brands Group Holding Limited,** a company incorporated in Bermuda and traded on the Hong Kong Stock Exchange

All four represented by Advs. Rami Landau and/or Roy Ozmar
By the Law Firm of Meitar Liquornik Geva Leshem Tal
16 Abba Hillel Rd., Ramat Gan 5250608
Tel: 03-6103100; Fax: 03-6103111

**Essence of the claim**: monetary and declaratory (affirmative order)

Amount of the claim: NIS 8,082,747 (for purpose of court fees), plus compensation for salary delay and/or interest and linkage.

# **Statement of Claim**

**The Plaintiff, Mr. Adi Haft, respectfully submits this Statement of Claim to the Court, in which the Court will be moved to order the Defendants, jointly and severally, to pay the Plaintiff:**

**A. Severance pay in the sum of NIS 3,402,497, plus delayed wages compensation and/or interest in linkage differentials as required by law;**

B. Prior notice payment in the amount of six month's salary, in the sum of NIS 991,500, plus delayed wages compensation and/or interest in linkage differentials as required by law;

C. A bonus in the sum of NIS 1,977,250 plus interest and linkage differentials as required by law;

D. Compensation for unlawful termination in the amount of 6 month's salary, in the sum of NIS 991,500 (for court fee reasons);

E. Compensation for damage to reputation and the Plaintiff's good name in the sum of NIS 720,000 (for court fee reasons).

And in total: the sum of NIS 8,082,747 (plus delayed wages compensation and/or interest in linkage differentials as required by law, as stated above).

Similarly, this Court will be moved to grant an order requiring Defendant 1 to provide the Plaintiff with a release letter for monies accrued in his favour in the Plaintiff's pension fund and managers' insurance fund.

Additionally, this Court will be moved to order the Defendants, jointly and severally, to defray the Plaintiff's court costs for this litigation, including attorney fees.

## A. Introduction

*"Scapegoating (from the verb "to scapegoat") is the practice of singling out any party or parties for unmerited negative treatment or blame as a 'scapegoat' - as being to blame and bearing responsibility for a negative situation, whether they cause it or not."* (Wikipedia)

1. For years, a German clothing company, that possesses a licence to use the Walt Disney Company Limited's brands ("**Disney**") has been in the practice of reporting to Disney, in a particular manner, about the quantity of its sales of articles of clothing to children, on which its brands have been used (the "**Disney Items**"). This is done for the purpose of calculating the amount of the royalties owed to Disney.

2. **All of the leaders of the German Company (as well as the leaders of its parent company – as shall be demonstrated below) not only new about the manner in which the reports were made, but rather supported the officers in the company who prepared them in such manner.**

3. **In 2017, during an audit that it conducted, Disney reached the conclusion that the manner in which the reports were prepared – as aforesaid, with the support of the company's leaders – constitutes, supposedly, "underreporting" and that actual sales were far greater. Thus, according to Disney, it was entitled to greater royalties.**

4. **The German Company, that is controlled by an international conglomerate, found itself in a state of befuddlement and dizziness on the part of representatives of that same conglomerate. Those same representatives sat together and sought each other's counsel: how could they placate Disney and soothe its ire.**

5. **Finally, the "solution" was found: the representatives decided to feign innocence and divert fire and responsibility to the Plaintiff and the Israeli Company (a subsidiary of the German Company), in which the Plaintiff served as the CEO. They even instructed the Plaintiff to indicate to Disney that the same reports stem from a computer malfunction at the Israeli Company (a claim that has no basis).**

6. **The representatives believed that by means of this failed tactic, they could kill four birds with one stone: one, closing the Israeli Company (which they had already planned and had even started to implement earlier); second, save on the costs involved in closing the company, by avoiding paying severance pay, prior notice, and an annual bonus to the Plaintiff; third, attributing and placing all responsibility on the Israeli Company and the Plaintiff who served as its director; and fourth, representing to Disney that is the conglomerate and its representatives are "cleaning the stables" (a misrepresentation, as will be explained below).**

7. For this reason, the Plaintiff was terminated from his employment with the Israeli Company during a telephone call. He was summoned, thereafter, to an artificial "hearing" whose entire purpose was to remedy their failures, by means of a peculiar, vague, and contradiction riddled summons. The Plaintiff's request for information and documents regarding the accusations raised against him fell on deaf ears. The "hearing" itself was conducted as an inappropriate and unfair cross-examination. Finally, the Plaintiff received a letter of termination in which he was informed that he will not be entitled, *inter alia*, to the severance pay and prior notice which were his due.

8. This final matter was what led the Plaintiff to understand that he had reached the end of his

rope and that he must turn to the courts to prevent his continued abuse and to protect his rights.

## B. The Parties to the Lawsuit

9. The Plaintiff, Mr. Adi Haft, established the TV Mania Group in 1997, together with his partner, Mr. Shimon Tal Doyev ("**Doyev**"). The group is engaged in the design, manufacturing, and distribution in Europe of children's clothing bearing well-known brands. The group includes the TV Mania companies in Israel, Germany, England, and Italy (the "**TV Mania Group**"). As shall be explained, below, in 2001, the Plaintiff and Mr. Doyev sold the TV Mania Group to a Hong Kong company by the name of LF Europe Limited, but until recently, remained as senior officers in the companies.

10. Defendant 1, TVM Design Services Ltd. (the "**Israeli Company**"), is a company in the TV Mania Group. The company engages in providing design services to TVM Europe GmbH (Defendant 2) and two other companies in the TV Mania Group.

11. The Plaintiff was employed by the Israeli Company since 1 January 1997 and until his termination on 3 August 2017. At first, the Plaintiff's position was that of co-CEO (together with his partner, Mr. Doyev), and following the Sale (as this term is defined, below), the title of his position was changed (as was Mr. Doyev's title) to Executive Vice President. In practice, he served as CEO (first as co-CEO together with Mr. Doyev, and in the last two years, as sole CEO). There is an employment agreement between the Israeli Company and the Plaintiff, dated 5 May 2011.

A copy of the Plaintiff's Employment Agreement in the Israeli Company (the "**Employment Agreement**") is attached to the Statement of Claim as **Exhibit A**.

12. Defendant 2, TVM Europe GmbH is the Israeli Company's parent company, holding all of its shares. The company engages in the sale of articles of clothing bearing leading brands, throughout Europe. Defendant 2 has used licences for those same brands that were granted to it, *inter alia*, by Disney.

13. Defendant 3, GBG International Holding Company Limited ("**GBG International**") is a company that is incorporated in the U.K. and directly holds all of Defendant 2's shares.

14. Defendant 4, Global Brands Group Holding Limited, ("**GBG**"), is a company incorporated in Bermuda but whose main offices are located in Hong Kong, and is also traded on the Hong

Kong Stock Exchange. GBG is the parent company in an international conglomerate of companies engaged in the field of clothing and, *inter alia*, is the ultimate parent company of Defendants 2-4. The company is the result of a "spinoff" that occurred in a Hong Kong conglomerate that, as aforesaid, acquired the TV Mania Group. In the framework of that same "spinoff", all of the rights and obligations of the original acquirer of the TV Mania Group were assigned to one of the GBG companies, such that currently, GBG and its representatives are the controlling shareholders in the various companies in the conglomerate, including in the TV Mania Group (whether directly or ultimately).

We note that in the Hearing Summons sent to the Plaintiff prior to his termination, it indicated that the entity considering terminating his employment in the Israeli Company is Defendant 4.

For the avoidance of doubt, attached as **Exhibit B** to the Statement of Claim is a tree diagram representing the relevant companies in the GBG Group and its subsidiaries in the TV Mania Group.

15. As will be explained, below, this lawsuit revolves around the actions and omissions of the representatives of GBG who, as aforesaid, control the TV Mania Group and fill various positions in the various companies in the group. Representatives of GBG are the ones who carried out the Plaintiff's unlawful termination from the Israeli Company and later, led to his rights being stripped from him. All this, while exclusively managing and controlling the Group's companies, without attributing great importance to the corporate wall between the Group's companies and while the companies acted as a conglomerate.

The Plaintiff will argue that under the circumstances in which the representatives of GBG managed the group of companies, the corporate veil must be lifted from the Israeli Company, in order to prevent discriminating against the Plaintiff and divesting him of his rights. This is reinforced where the Israeli Company was "emptied" of any operations or substance, and it faces a future in which it will not be able to pay its debts to the Plaintiff. The Plaintiff will further argue that the Defendants jointly acted as his employer and that they are liable to him jointly and/or severally, in particular where we are dealing with rights rooted primarily in the field of cogent labour law. Alternatively, the Plaintiff will argue that Defendants 2-4 are liable to him as those who caused Defendant 1 to reach the agreement with him and to divest him of the rights to which he is entitled upon termination.

In this Statement of Claim, when discussing "representatives of GBG" – the reference is to

GBG's representatives, whether in their hats as officers in the Israeli Company, the Defendant 2, or in any of Defendants 2-4.

## C. The Unfolding of Events

### C(1) Establishment and Sale of the TV Mania Group

16. As aforesaid, in 1997, the Plaintiff and Mr. Doyev established the TV Mania Group, and jointly served as its directors. Over the years, and because of the successful management by the Plaintiff and Mr. Doyev, the group grew and turned into a worldwide business, one of the leaders in its field, composed of companies in Israel, Germany, the UK, and Italy.

17. The Plaintiff's and Mr. Doyev's hard work and the good relationship that they developed with a number of the large players in the clothing market resulted in the TV Mania Group succeeding in acquiring use licences for a number of favourite children's brands around the world (such as "Teletubbies," "Power Rangers," "Hello Kitty," and "Mickey Mouse").

18. The nature of the engagement with the owners of those same brands was, in general, identical: one of the companies in TV Mania Group was granted a licence to manufacture articles of clothing for children bearing the relevant brand, and to sell these articles throughout Europe. The brand owner, in turn, was entitled to receive a particular percentage of the income from the sale of those same articles as royalties.

19. One of the companies that granted the TV Mania Group such licences was Disney. Accordingly, the TV Mania Group sold articles of children's clothing during Disney characters throughout Europe, and paid Disney royalties. Similar to the other brand owners, Disney also was in the custom of conducting audits of sales data for the TV Mania Group every two years.

20. In 2009, representatives of a Hong Kong clothing conglomerate, "Li & Fung", contacted the Plaintiff and Mr. Doyev and inquired about acquiring the TV Mania Group.

21. For more than a year, the parties conducted intensive negotiations, during the course of which representatives of Li & Fung conducted comprehensive due diligence reviews of the TV Mania Group, received all of the information they requested (including financial statements and complete sales and royalty payment data), and got to know the group inside and out.

22. At the end of this process, the parties reached understandings and executed an agreement on 26 March 2011, in which the Plaintiff and Mr. Doyev (as well as Ms. Siracharin

Siripornpermsak, who held shares in a few of the group's companies) sold all of their shares in the TV Mania Group to LF Europe Limited (the "**Original Purchasing Company**") other than TVMania GmbH and that was the German Company in the TV Mania Group and whose assets (and not its shares) were acquired by Original Purchasing Company and transferred to Defendant 2 (Defendant 2 will hereinafter be called the "**German Company**") (the "**Sale**").

Following the Sale, on 5 May 2011, the Employment Agreement was executed, that recognised the Plaintiff as an employee of the Israeli Company as of 1 January 1997, for all intents and purposes.

23. In 2014, further to the spinoff by the Li & Fung, all of the Original Purchasing Company's rights and obligations were assigned to Defendant 3, GBG International, a subsidiary of GBG (Defendant 4).

24. Since the sail, the Plaintiff and Mr. Doyev continued to serve in senior positions in the TV Mania Group's companies. As part of this, since the Sale and until his termination on 3 August 2017, the Plaintiff served as Executive Vice President of the Israeli Company and until September 2017, as Geschäftsführer in the German Company (equivalent to CEO), and also served as a director in the German Company. Mr. Doyev served until recently (to the best of our knowledge, until September or October 2017) as a director in the Israeli Company.

25. Both the Plaintiff and Mr. Doyev filled their positions with limitless commitment, under the guidance of representatives of CBG, coordinating with them on a daily basis, and in full acceptance of their authority.

### C(2) The Audit Conducted by Disney

26. In January 2017, representatives of Disney came to the German Company's offices in order to carry out an audit of the company's books. The purpose of the audit, similar to audit conducted in the past) both before the Sale and thereafter) was to examine the amount of the royalties paid to Disney as a derivative of the German Company's sales.

27. During that same examination, representatives of Disney found that there was allegedly "underreporting" – meaning that the reports that were provided to Disney in connection with the sale of Disney Items were lower than actual reports.

28. While Disney's representatives were present in the German Company's offices examining its

books, "systemic commotion" began among the representatives of CBG. This commotion was expressed, *inter alia*, and an express instruction given to the Plaintiff by Mr. Bruce Rockowitz CEO and vice president of GBG and a member of the boards of directors in both GBG as well as in the German Company ("**Rockowitz**"), to misrepresent to Disney that this same "underreporting" stems from a computer glitch in the Israeli Company.

29. We must note that **Mr. Rockowitz and all of the other representatives of GBG who had off the serial positions in the TV Mania Group not only knew about the customary reporting method throughout the years, but rather supported it. The reason for this is clear. Throughout the years, representatives of GBG enjoyed the revenues from the German Company, where this reporting method apparently helped maximise them. When Disney complained, they decided to divert fire and responsibility in the Plaintiff's direction.**

### C(3) The Plaintiff's Termination

30. During conversations that the Plaintiff held with representatives of GBG after the audit conducted by Disney in the German Company's offices, he discovered that GBG paid Disney, as an "interim payment," the sum of €25,750,000 in light of the "underreporting" that had been discovered, supposedly (to this day, it is unclear to the Plaintiff what is the substance and nature of that same "interim payment" was and whether, in consideration of the same payment, Disney abandoned its claims in this context).

31. He further discovered representatives of GBG had turned both the Israeli Company as well as the Plaintiff himself into scapegoats.

32. As early as January 2017, Mr. Dow Famulak, a senior director at GBG and the German Company and a director in the Israeli Company who served as the direct supervisor for the Plaintiff ("**Famulak**"), instructed the Plaintiff to go on administrative leave (subject to him "helping where needed").

33. A number of months later, on 9 May 2017, the Plaintiff held a tense and terse telephone conversation with representatives of GBG as well as all of the other companies in the Group, in which **Mr. Ronald Ventrichelli**, GBG's finance manager, yelled at the Plaintiff and informed him that he was terminated from his employment in the Israeli Company.

34. Sometime thereafter, on 17 July 2017, the Plaintiff received a summons to a hearing which stated that GBG is considering terminating his employment (apparently, after representatives

of GBG received legal counsel and discovered that in Israel, you cannot suddenly and offhandedly terminate employees) (the **"Hearing Summons"**).

A copy of the Hearing Summons is attached to the Statement of Claim as **Exhibit C**.

35. As will be explained in Chapter D(3), below, the Hearing Summons had many defects, including inherent contradictions. Additionally, the claims made against the Plaintiff therein were not backed up by any document, and it was completely unclear on what they were based.

36. Therefore, on 21 July 2017, the Plaintiff sent his response to the Hearing Summons, in which he explained that it was clear to him that the decision to terminate him had already been made long ago (and was even "dropped" on him during a telephone conversation) and, under these circumstances, it can be assumed that the "hearing" would not be held with an open mind.

37. Similarly, the Plaintiff requested clarification regarding the claims specified in the summons, as well as relevant documents (supposedly) supporting them.

A copy of the Plaintiff's letter dated 21 July 2017 is attached to the Statement of Claim as **Exhibit D**.

38. On 25 July 2017, a response was received which this time, was sent by the Israeli Company (by means of its attorney) and in which the Israeli Company rejected all of the Plaintiff's requests other than the request to postpone the "hearing" by a number of days (which was also not fully granted).

A copy of the Israeli Company's letter dated 25 July 2017, as well as the continuation of the exchange of letters on the subject, are attached to the Statement of Claim as **Exhibit H**.

39. The "hearing" finally took place on 1 August 2017. In addition to the Plaintiff and the parties' attorneys, Mr. Famulak and Ms. Jennifer Bennett, who serves as GBG International's director of manpower, were also present at the hearing. Not surprisingly, the hearing was nothing more than an attempt to conduct a cross-examination against the Plaintiff and to extract statements from the Plaintiff that could be used by representatives of GBG in the lawsuit filed by GBG International against the Plaintiff and Mr. Doyev in an arbitration action in London. This is a lawsuit in which GBG International claims a breach of the representations in the TV Mania Group's sale agreement. (The Plaintiff and Mr. Doyev deny what is claimed in that same lawsuit and filed a statement of claim as well.) We note that in the framework of the hearing,

the Plaintiff denied the claims against him and, *inter alia*, explained that he cannot address the merits of the claims in light of the fact that he was not provided with the documents and information on which representatives of GBG supposedly based their claims.

40. On 3 August 2017, the Plaintiff received a letter informing him of the termination of his employment with the Israeli Company (the **"Termination Letter"**), that stated, *inter alia*, he was informed that, "The company has found that there were circumstances justifying termination without severance pay and without payment for prior notice."

A copy of the Termination Letter is attached to the Statement of Claim as **Exhibit F**.

41. We must note that parallel to the Plaintiff's termination, GBG completed a course of action in which the decided majority of the employees of the Israeli Company was laid off. At the end of 2015, a decision was made to close the Israeli Company and cease its operations as part of an overall organisational streamlining and the transfer of design operations to the German Company. Accordingly, by the end of July 2017, approximately 45 employees were laid off as a result of the shutting down of the Israeli Company's operations (this was expressly indicated in the hearing summonses they received) and, during the course of 2016, the transfer of the Israeli Company's operations and assets to the German Company was begun.

42. To the best of the Plaintiff's knowledge, in July 2017, most of the employees of the company received a Hearing Summons and, and almost all of them, it stated that the cause was the shutting down of the Israeli Company's operations. Immediately thereafter, the Israeli Company stopped providing design services to the German Company and other companies in the TV Mania Group. As of this date, these services transferred to the German Company's field of responsibility.

43. However, the Plaintiff received a differently worded Hearing Summons, in which it was written or that the reason for the hearing was the "underreporting" of which the Plaintiff was supposedly aware and which he supposedly approved.

44. As will be explained, below, the Plaintiff will argue that this is a transparent attempt to avoid the Israeli Company's obligation to pay the Plaintiff his annual bonus, severance pay, and prior notice pay.

## C(4) GBG's Representatives' Outrageous Attempts to Force Employees to Sign an Affidavit Against the Plaintiff

45. The Plaintiff was made aware that representatives of GBG had contacted a number of employees of the Israeli Company after they had received hearing summonses (that indicated, as aforesaid, that the reason for which the employee was summoned to a hearing was the shutting down of the Israeli Company's operations), and asked those same employees to sign affidavits in connection with the same "underreporting" to Disney. Those same employees understood, of course, that in order to satisfy GBG, they must write an affidavit that "compromises" the Plaintiff and Mr. Doyev. Similarly, according to evidence in the Plaintiff's possession, representatives of GBG hinted that failure to cooperate on the part of the employees is likely to result in "for cause" termination, with all that this implies (meaning, termination without severance pay and without prior notice).

46. Indeed, to the best of the Plaintiff's knowledge, at least two of the company's employees first received a Hearing Summons which stated that the reason was the closing of the Israeli Company. However, after they refused to sign such an affidavit, very received a new summons in which claims were made against them tying them, allegedly, to the "underreporting" and they were informed that the company was considering terminating them "for cause" (meaning: without severance pay or prior notice pay).

47. It seems that we need not elaborate on the extent of the severity of these actions and have troubling they are.

## D. The Plaintiff was Terminated in a Defective and Improper Process and was Unlawfully Deprived of his Rights

### D(1) The Real Reason for the Plaintiff's Termination in the Way it was Done – the Closing of the Israeli Company While Reducing Costs

48. As aforesaid, at the end of 2015, representatives of GBG decided to close the Israeli Company and cease its operations as part of an organisational streamlining.

49. Because of that same decision, the company (which at that time, included approximately 60 employees) commenced staggered termination proceedings that were designed to result, in the end, in the termination of all of the Israeli Company's employees, including the Plaintiff. As a result, by July 2017, approximately 45 employees had been terminated, and the plan was to complete the termination of the rest of the employees and to close the company by the end of 2017. To the best of the Plaintiff's knowledge, as of the date of the filing of this lawsuit, the

Israeli Company employees only a few employees, who are expected to and their employment with the company at the end of 2070.

50. Accordingly, in July 2017, hearing summonses were sent not only to the Plaintiff, but rather to all of the other employees of the company.

51. However, strangely, while the summonses sent to the other employees stated that the reason for the hearing was the company's intent to shut down its operations, in the summons sent to the Plaintiff, the reason given for his expected termination was his knowledge of the "underreporting" to Disney and the approval he supposedly gave for those same instances of underreporting.

52. This was a (very transparent) attempt to "ride out the storm" of the "underreporting" affair opposite Disney.

53. There is no, nor can there be, any doubt that representatives of GBG intended to terminate the Plaintiff's employment regardless, as part of closing the company. This is demonstrated, *inter alia*, by an application submitted on 1 November 2016 to the Ministry of the Economy for a permit to terminate a pregnant employee. A list of all of the employees of the Israeli Company who were facing the loss of their employment because of the closing of the Israeli Company was attached to this application. (At that time, the intention was to complete this process by the end of 2016, but the matter was delayed because of internal considerations by representatives of GBG.) That list included, of course, the Plaintiff's name.

A copy of the list is attached to the Statement of Claim as **Exhibit G**.

54. By way of explanation, we note that as part of the process of closing the Israeli Company and transferring its operations and assets, during the course of 2017, a number of key employees of the Israeli Company were transferred to the German Company. Similarly, the Israeli Company's design portfolio was transferred to the German Company, as was the IT equipment that was owned by the Israeli Company (such as servers and computers). Furthermore, to the best of the Plaintiff's knowledge, the Israeli Company recently offered its furniture for sale.

55. Representatives of GBG decided to take advantage of the "Disney affair" in order to achieve four goals:

**One** – to complete the closing of the Israeli Company and in this framework, to terminate the Plaintiff as well (as they planned to do regardless);

**The second** – to use the "Disney affair" as an excuse to breach the company's obligation to pay the Plaintiff severance pay, prior notice pay, and an annual bonus (as it would have been required to if representatives of GBG would admit that the Plaintiff was terminated because of the closing of the Israeli Company's operations);

**The third** – to use the Plaintiff and the Israeli Company as "scapegoats" and to place responsibility on them;

**And the fourth** – to create an impression for Disney that representatives of GBG are "cleaning the stables" after having been caught in the act.

56. To be precise, the conduct by the representatives of GBG makes it clear that the matter of the "underreporting" was not what was truly at the basis of the Plaintiff's termination.

57. It is sufficient, for example, if we take note of the fact that the Plaintiff served in the role of CEO and director in the German Company up until 7 September 2017. By way of explanation, we note that the Plaintiff, based on his position as CEO of the German Company, had exclusive signatory rights (unrestricted in amount) in this company.

58. It should be noted that had the Plaintiff's (claimed and denied) actions and omissions been so severe to the point of justifying depriving him of his right to severance pay and early notice pay, representatives of GBG would not have permitted the Plaintiff to continue to serve as CEO of the German Company for even one more minute, after the allegedly "discovered" those same actions and omissions.

59. However, between the date on which they supposedly discovered those same actions and omissions (meaning - June 2016 as indicated in the Hearing Summons) and the date on which his services as CEO and director in the German Company were terminated, as was his status as the person with exclusive signature rights in said company, nearly a year and a half (!!) had passed. As aforesaid, the Plaintiff was also terminated from the Israeli Company only a year after that same claimed (and denied) "discovery."

60. Additionally, the Plaintiff will argue that had his (claimed and denied) actions and omissions been so severe as to justify his termination, representatives of CBG would not have waited approximately six months before instructing him to go on administrative leave, and certainly

would not have waited <u>almost an entire year</u> before terminating him, together with all of the other employees in the company.

61. Under these circumstances, the Plaintiff will argue that the decision to prevent him from receiving his severance pay, prior notice pay, and an annual bonus, which are his due is improper, is motivated by foreign considerations, and violates the law and must therefore be reversed.

62. The Plaintiff will argue that this is not "for cause" termination under paragraph 9.5 of the Employment Agreement, and regardless, this is not termination justifying denying him an annual bonus, severance pay, and without prior notice under the law.

### D(2) GBG's Awareness of the Reporting Method

63. As aforesaid, the Plaintiff will argue that the manner of reporting to Disney was not the basis for his termination. However, even were it to be said that this was the reason for his termination (and this is not so), it does not change the fact that his termination, as well as his suspension in January 2017, were unlawful.

64. The Plaintiff will demonstrate that representatives of GBG knew how reports were made to Disney in connection with the sales by the German Company and that they supported this reporting method over the years. Mr. Rockowitz, as aforesaid, even instructed the Plaintiff to make a misrepresentation to Disney and claimed that the "underreporting" allegedly stemmed from a computer glitch in the Israeli Company (see, paragraph 28, above).

65. It is clear that an employer who not only knows about a particular action performed by an employee but rather supports that same action cannot terminated the employee because of that same action. If he terminates him nonetheless – certainly he cannot deprive the employee of severance pay, prior notice pay, and any other right he is due according to the law or his Employment Agreement.

66. This is clear and obvious.

67. We will further note that irrespective of the fact that representatives of GBG knew of and supported the manner in which reports were made to Disney, the Plaintiff will argue that the matter of the "underreporting" that was supposedly done by the German Company (while the Plaintiff is employed by the Israeli Company) does not in and of itself justify "for cause"

termination.

68. Therefore, even if those same instances of "underreporting" resulted in the Plaintiff's termination (and this is not the case), this is termination that is unlawful and unjustified, and certainly under the circumstances, there is no basis for depriving the Plaintiff of his right to payment of his annual bonus, severance pay, and prior notice pay.

## D(3) The "Hearing" that was Held for the Plaintiff was Fundamentally Defective and Far from Meeting the Requirements of the Law

69. There is no need to elaborate on the importance of the hearing process. This is an opportunity given to an employee, prior to losing his livelihood, to know why his continued employment is under consideration, and to express his position on the matter. An employer must attend a hearing with an open mind, and not hide anything from the employee. See, e.g., L.A. (National) 1027/01 Gutterman v. Jezreel Valley Academic College [7.1.2003]:

> *"The right to be heard is not merely saying, it should not be regarded as a 'ceremony' that must be held, perfunctorily, in order to fulfil an obligation. The right to be heard is one of the fundamental rights in our legal system and its purpose is to ensure that a salient, informed, and clear decision is made, while taking full note and giving appropriate weight to the positions and interests of one who is likely to be harmed by this decision. It is the employee's preliminary right to know the claims made against him or in his case and to provide his response to them accordingly, to present the other side from his point of view, and to attempt to persuade the person of authority to change his mind to the extent that it will harm his rights (see, e.g., L.C.H. 48/3-148 Shekem Ltd. v. Greenberg [1], at 143).*

> *This is the extent of the right, and from this stems the obligation imposed on the employer – to present the employee with the claims directed against him, the questions that have arisen in his case that can influence the decision maker. All this must be done openly, fairly, and in good faith, denying employee anything. The way in which the hearing is to be held has long been established. It may be done in writing or in the presence of a person authorised for such purpose. The primary point is the employer's obligation to heed the employee's arguments and hear them impartially, with a clear heart, and willing soul, before making the*

*final decision that is likely, very often, to be irrevocable and decisive with regard to him."*

70. In our case, there is no doubt that the "hearing" was entirely artificial and done solely for show. The decision to terminate the Plaintiff had been made long before, as imparted to him in the telephone conversation that he held with representatives of GBG (see, paragraph 33, above).

71. However, beyond the fact that this was an artificial "hearing" held in order to fulfil an obligation, the proceeding itself appears to have suffered from every possible defect.

72. **First**, what was stated in the Hearing Summons received by the Plaintiff. The Plaintiff will argue that this summons does not meet the requirements of the law as it is peculiar, vague, and full of inherent contradictions (that were also not clarified in the letter from the Israeli Company's attorney dated 25 July 2017).

73. In an attempt to justify the fact that a long time had passed from the date on which representatives of GBG supposedly "discovered" that the Plaintiff was involved in "underreporting" and the date on which he was suspended from his employment, the Hearing Summons noted that, "The Company only now knows that the Plaintiff knew of and approved" those same reports.

74. However, an examination of paragraphs 1.1, 1.2.1, and 1.2.3 to the Hearing Summons demonstrates that according to GBG's own (denied) claim, its representatives had already discovered in June 2016 that there were instances of "underreporting" of which the Plaintiff was aware.

75. It is difficult not to wonder how representatives of GBG can make both of these claims, almost in the same breath. It appears that this is yet another instance in which they have become entangled in their own baseless statements.

76. **Second**, as aforesaid, on 21 July 2017, the Plaintiff responded to the Hearing Summons (by means of his attorney). The Plaintiff requested information and documents (supposedly) supporting the claims made against him in order to appropriately prepare for the hearing. This request was also refused (with good reason), while referencing an irrelevant document.

77. It should be noted that the company bore responsibility for presenting the Plaintiff with all of

the documents and information on which it supposedly based its claims, and a breach of this obligation avoids the hearing process of any substance. See, e.g., L.A. (National) 371/05 **Oz et al v. Haifa University** [19.12.2005]:

> *"One against whom claims are made which in the end will result in harm to him, it is only appropriate that he know each and every claim made against him and be able to respond. Thus, during a hearing, all of the material on which the decision-makers based their decision must be presented to the party being harmed in order that he be able to respond."*

78. In this context, we note that in the last months of his employment, representatives of GBG ordered an audit of the Israeli Company, with the purpose of locating failures that will allow a connection to be drawn between the Israeli Company and the organs operating therein, and between the claimed "underreporting."

79. Whereas the Plaintiff knows that an investigation was conducted by the Deloitte accounting firm, he saw fit to request the investigation's findings as part of a list of documents and information that he requested in preparation for the hearing deliberations. Inasmuch as representatives of GBG decided to summon the Plaintiff to a hearing under the pretext of such severe circumstances, it seems that there is no more relevant document that that, in preparation for the hearing.

80. In the response letter received by the Plaintiff, the Israeli Company did not deny that an investigation was conducted. Rather, it claimed that, "The document indicated by you as 'the findings of Deloitte's investigation' does not exist," and nothing more. This answer cannot but raise wonder. It is inconceivable that the Plaintiff was summoned to a hearing before the investigation in the Israeli Company was completed, and if the investigation was completed, it is hard to understand why the Plaintiff was denies his right to examined the document, or at the very least, it is inconceivable that the investigation was completed without there being a document documenting the investigation process and its findings.

81. Third, while the summons that he was sent claimed that the Plaintiff "knew of and approved" the "underreporting," during the "hearing" itself, the Plaintiff was accused of being the "architect" behind the "underreporting." Thus, in the framework of the cross-examination that the representatives of GBG sought to conduct against the Plaintiff (which in and of itself is unlawful, and its real objective was to utilise Defendant 3 in the arbitration against the Plaintiff

and Mr. Doyev), he was forced to respond, *inter alia*, to the blame placed on him but that had not been attributed to him in the Hearing Summons.

82. **Fourth**, as was explained above, in the Hearing Summons as well as during the "hearing" itself, representatives of GBG made a false representation that the Plaintiff's termination was connected to the "underreporting" to Disney, while his termination actually stemmed from the decision to close the Israeli Company, while reducing costs.

83. All of this demonstrates that the "hearing" process was defective from start to finish, in a manner that violated the Plaintiff's rights under the law.

### D(4) The Plaintiff's Termination is Also Improper Because of the Absence of a Board of Directors Resolution

84. To the best of the Plaintiff's knowledge, his being summoned to the hearing, as well as the decision to terminate him from the Israeli Company was not made by the organs authorised to do so under the Companies Law, 1999 (the "**Companies Law**").

85. In this context, we must once again note that the Plaintiff served in the senior-most administrative position in the Israeli Company and served as an officer therein. Therefore, in accordance with Section 251 of the Companies Law, the body authorised to decide to terminate the Plaintiff is the company's board of directors – and it alone (to the best of the Plaintiff's knowledge, the company's articles of association do not stipulate otherwise).

86. Despite the vague claim in paragraph 4 to the Termination Letter, which claims that the decision to terminate the Plaintiff was made by the "authorised entities," representatives of GBG did not specify how, where, when, and by whom the decision was made. This obviously reinforces the suspicion that the decision was not properly made and that representatives of GBG seek to hide this fact.

87. Parenthetically we note that to the best of the Plaintiff's knowledge, the decision to shut down the Israeli Company and lay off its remaining employees was also not made by the company's board of directors, or even deliberated by it.

88. The Plaintiff would be surprised to discover otherwise as, to the best of his knowledge and as demonstrated by the Israeli Company's registration extract from the Companies Registrar dated 31 July 2017, one of the three directors and the Israeli Company was Mr. Doyev. It

should be noted that Mr. Doyev was not informed at all regarding the matter of the Plaintiff's termination, nor was he given an opportunity to express his opinion on the matter as a director in the company. An examination of the Registrar extract for the Israeli Company on the date of the filing of this lawsuit shows that Mr. Doyev no longer serves as a director.

A copy of the Companies Registrar extract is attached to the Statement of Claim as **Exhibit H**.

89. It is possible that had GBG conducted itself in a proper and orderly manner and in accordance with the law, including ensuring that important matters on the agenda be deliberated with great solemnity by the Israeli Company's board of directors, it would have refrained from its outrageous conduct throughout this affair.

90. The fact that it chose not to do so (to the extent the Plaintiff is aware) constitutes an additional severe and substantive defect in the Plaintiff's termination proceedings.

## D(5) The Campaign of Persecution and Incitement Conducted Against the Plaintiff by the Representatives of GBG Also Casts a Heavy Shadow on the Termination Process

91. If all of the above is not enough, we will reiterate that in the framework of its persecution campaign against the Plaintiff and using him as a "scapegoat," representatives of GBG attempted to obtain affidavits against the Plaintiff and Mr. Doyev from the Plaintiff's colleagues at the Israeli Company.

92. In at least one case, a representative of GBG even told an employee that if she refuses to sign the affidavit, her termination would be "for cause" (such that she will not be entitled to severance pay and prior notice pay).

93. In two other cases, employees who first received a Hearing Summons given the expected closing of the company, received an "amended" summons after refusing to cooperate and sign the affidavit, in which it was explained to them that the company is considering terminating them "for cause."

94. GBG should show contrition for its conduct in this context as well. The Plaintiff believes that these are actions that cross a redline of reasonableness, fairness, and legality. It almost need not be said that under the circumstances, a proper termination process cannot be carried out and it is clear that the entire process is fundamentally improper and defective.

## E. Relief Sought

95. In light of the above, the Plaintiff will argue that his termination was carried out unlawfully and that there were no circumstances under the law justifying denying them severance pay, prior notice, and an annual bonus.

96. The Plaintiff will further argue that the Defendants, by their above actions and omissions, caused sever harm to his reputation and his good name among his colleagues and professional and personal acquaintances.

97. The Plaintiff will further argue that the Defendants are liable to him, jointly and severally, for all of the damages incurred by him and to the payments that the Israeli Company has refrained from paying him in violation of the law.

98. In this context, we emphasise that representatives of GBG themselves did not ensure (to put it mildly) to distinguish between the different companies in the group and acted, for almost all intents and purposes, as one unit. This, *inter alia*, is the reason that they saw fit to terminate the Plaintiff from his employment with the Israeli Company for actions that he (supposedly) performed at the German Company. This is also the reason that in the Hearing Summons letter sent to the Plaintiff, it stated that the "Global Brands Group," meaning – the entire group, is considering his termination from the Israeli Company.

99. Under the circumstances of action taken as a conglomerate, clearly the Defendants cannot be permitted to hide behind the veil of corporate separation when it is convenient for them, when they themselves absolutely ignored this veil when their actions were committed against the Plaintiff jointly, as one unit, without any substantive distinction between the various companies, especially in light of the fact that, as described above, the Israeli Company underwent a process of being "emptied" of all of its assets and its operations, and is currently facing closing down, and the Plaintiff is likely to find himself at an impasse. Alternatively, the Plaintiff will argue that the Defendants acted with regard to him as joint employers and alternatively, they must be joined to the lawsuit given the fact that in order to "clean the oil," the caused the Israeli Company to breach its Employment Agreement with him.

100. To be precise, even from a formal standpoint, the Plaintiff will argue that a portion of the torts and violations committed against the Plaintiff that are the subject of this lawsuit, were committed by representatives of GBG in their hat as directors and officers in Defendants 2-4.

101. Therefore, as aforesaid, all of the Defendants bear, jointly and severally, full liability toward

the Plaintiff.

102. Therefore, the Court is petitioned to order the Defendants (jointly and severally) to pay the following sums to the Plaintiff (we clarify that the Plaintiff's monthly salary was NIS 165,250 (gross), and a copy of the Plaintiff's last pay slips is attached to the Statement of Claim as **Exhibit I**):

A. Compensation for unlawful termination in the amount of six month's salary, for a total sum of **NIS 991,500** (for court fee reasons) plus linkage differentials and interest as required by law;

B. Prior notice payment in the amount of six month's salary (in accordance with the Employment Agreement), in the sum of **NIS 991,550,** plus delayed wages compensation and/or interest in linkage differentials as required by law;

C. Severance pay in the sum of **NIS 3,402,497,** (calculated according to his final salary multiplied by 20.59 years of employment, where the period of employment is from 1 January 1997 to 3 August 2017), plus delayed wages compensation and/or interest in linkage differentials as required by law.

It is clarified that as of the date of the filing of this statement of claim, the Plaintiff has not received a letter to release ownership of the compensation pay accrued in his favour in his pension fund and in his managers' insurance fund. Therefore, the Plaintiff places his claim at the full severance pay amount which he is due. To the extent the Israeli Company releases the amount of the severance compensation in favour of the Plaintiff, the amount accrued as severance pay will be offset from the amount specified under this section.

We further note that the General Approval regarding employer payments to a pension fund and insurance fund in place of severance pay under Section 14 of the Severance Pay Law, 1963 (the "**General Approval**") was attached to the Plaintiff's Employment Agreement. However, the terms stipulated in the General Approval that, when met, will result in the contributions made by the employer in favour of such compensation taking the place of the obligation to pay severance pay at the end of the employment relationship are not included in the Plaintiff's Employment Agreement and, therefore, the Plaintiff will argue that the conditions for applying the arrangement stipulated in the General Approval do not apply to this case.

To complete the picture, we must add that to the best of the Plaintiff's recollection, he was required to sign some document regarding his severance pay immediately prior to the end of his employment. The Plaintiff was not provided with a copy of that document but, regardless, the Plaintiff argued that to the extent that same document purports to condition, reduce, or restrict the Plaintiff's rights to full severance pay in any way, such document lacks any legal effect.

D. Payment of a bonus in the sum of NIS <u>1,977,250</u> plus interest and linkage differentials as required by law. To be clear, this amount was paid to the Plaintiff as a bonus for 2015 and it was agreed that this amount would be paid to the Plaintiff with respect to 2016 as well.

E. Compensation for damage to reputation and the Plaintiff's good name in the sum of NIS 720,000 (for court fee reasons). We emphasise, in this context, that the severe accusations made against the Plaintiff and the degrading way in which he was terminated, in shame, were made known - by the nature of things - to many of his colleagues, friends, and family members. On a number of different occasions, the Plaintiff was "lucky" enough to discover that the rumour had grown wings. His good name and reputation, for which he had laboured for decades, were severely stained. It should be noted that what was said and represented about the Plaintiff also constitute defamation under the Defamation Prohibition Law, 1965.

103. In total, the Court will be petitioned to order the Defendants to pay the Plaintiff the total sum of **NIS 8,082,747**.

104. Similarly, this Court is moved to grant an order requiring Defendant 1 to provide the Plaintiff with a release letter for monies accrued in his favour in the Plaintiff's pension fund and managers' insurance fund.

105. This Court has both local and subject matter jurisdiction to here this lawsuit, taking note of the fact that the central location where the work was performed was Herzliya, and none dispute that the causes of action fall under the exclusive jurisdiction of this Court to hear the lawsuit.

106. Therefore, this Court will be petitioned to find for the Plaintiff and to award the Plaintiff all of the requested relief and to obligate the Defendants, jointly and severally, to pay court costs and attorney fees plus VAT as required by law.

| _____ | _____ | _____ |
| Maya Schneider Hecht, Adv. | Gideon Weinbaum, Adv. | Tamar Winter Kamar, Adv. |
| Epstein, Rosenblum, Maoz (ERM) | Epstein, Rosenblum, Maoz (ERM) | Orna Lin & Co. |
| Counsel for the Plaintiff | Counsel for the Plaintiff | Counsel for the Plaintiff |